IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VAUGHN NEITA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 19 C 595 |
| | ) |
| CITY OF CHICAGO, et al., | ) Judge Joan H. Lefkow |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Vaughn Neita was arrested by Chicago Police Officers Karen Rittorno and Domingo Enriquez on February 7, 2018, for violating the Illinois Humane Care for Animals Act, 510 ILCS 70/1 *et seq.* He brings this action against Rittorno and Enriquez under 42 U.S.C. § 1983 for false arrest, illegal search and seizure, conspiracy to deprive of constitutional rights, retaliatory arrest, and failure to intervene. He also brings Illinois state law claims against Rittorno and Enriquez for malicious prosecution and against the City of Chicago for indemnification. Defendants move for summary judgment on all counts (dkt. 138). For the reasons stated below, defendants are entitled to qualified immunity on Neita's federal claims, and the court declines to exercise its supplemental jurisdiction over the remaining state law claims.

## BACKGROUND

On summary judgment, the court relies on the factual assertions and objections thereto contained in the parties' Local Rule 56.1 submissions, and it may enforce strict compliance with Local Rule 56.1 procedures. *See Curtis* v. *Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015); *Stevo* v. *Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011). What follows are the relevant and properly supported factual assertions, based on the undisputed facts as admitted by the parties or,

if an objection to an asserted fact was raised, based on the court's review of the underlying evidence cited in support of or opposition to the fact. *See Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Thus, if a submitted fact is not included below, it is because it either was immaterial and provided no helpful context or was unsupported by the evidence.

I.    **Summary Judgment Facts**

In February 2018, Officers Karen Rittorno and Domingo Enriquez worked on a team within the Chicago Police Department that responds to reports of animal abuse. (DSOF ¶ 3–4; RDSOF ¶ 3.)[1] As of that time, both Rittorno and Enriquez had worked as police officers for more than 15 years. (DSOF ¶ 4.)

On February 4, 2018, Rittorno received an email from Andreas Morgen, an agent with Chicago's Department of Animal Care and Control, about a situation at 413 North Central Park. (DSOF ¶ 5.) Morgen's email stated, in relevant part:

> At the above address we [have] two reports of a dog being kept in in-humane conditions. The owner is a male who allegedly is squatting at the above address in either a camper/trailer or a small shipping container. We only have a first name of "Von". He allegedly has multiple "animal cruelty convictions" on his record. Can you investigate this & contact us if you find grounds to impound the dog?

(PSOF ¶ 1.)

On February 7, which was a cold day with snow on the ground (DSOF ¶ 7; dkt. 139-2, ex. D), Rittorno and Enriquez went to the lot at 413 North Central Park (PSOAF ¶ 1) wearing plain clothes and driving a covert vehicle (PSOAF ¶ 6). Before they arrived at the scene, Rittorno told Enriquez that she had "received information that there was a dog abandoned, and had gotten

---

[1] This decision cites defendants' LR56.1(a)(2) statement of facts (dkt. 139) as "DSOF ¶_" and Neita's LR56.1(b)(3) statement of additional facts (dkt. 147) as "PSOAF ¶_." Responses to an asserted fact are indicated with an additional "R," as in "RDSOF" or "RPSOAF." (*See* dkts. 146, 163.)

several calls from neighboring citizens in the area that he was left in an empty lot overnight several days." (RDSOF ¶ 8; dkt. 139-3 at 12:17–22.) There was no permanent structure built on the lot (DSOF ¶ 9), but Neita had parked his mobile home there and used the lot for storage. (RPSOF ¶ 3; RDSOF ¶ 9.) Neita went "back and forth" between living on the property and staying with a friend, and he was not living on the property on February 7. (Dkt. 139-7 at 18:13–18.)

The officers could not see a dog from the front of the lot, so they drove around to the alley. (DSOF ¶ 10.) From there, they saw the dog, Macy, tied to the bumper of a truck on the lot. (DSOF ¶ 11.) When they saw Macy peeking out of the doghouse, Rittorno immediately took pictures of her. (PSOAF ¶ 7.) They then drove back to the front of the lot, parked, and went on to the lot; no one responded when they announced their presence. (DSOF ¶ 12.) On the lot, there was a vehicle sitting with its window open and multiple vehicles that were covered in snow. (RDSOF ¶ 13; dkt. 139-2 at ex. F.) Macy was wearing a collar that was attached to a leash, which was then attached to another leash that was affixed to the front bumper of a truck. (DSOF ¶ 14.) Enriquez later testified that, in his experience, he had "seen dogs basically choke themselves to death being left alone" while leashed. (RDSOF ¶ 14; dkt. 139-3 at 29:21–22.) The officers did not know how long Macy had been alone. (PSOAF ¶ 16.)

There was a doghouse approximately three feet tall next to the truck where Macy was leashed (RDSOF ¶ 15; RPSOF ¶ 4.) The doghouse was constructed of plywood, framed with lumber designed for wet contact, and had a plywood floor that was at least partially covered with cardboard. (Dkt. 139-2 at ex. M; DSOF ¶ 16; PSOAF ¶ 4.) The officers did not check whether there was any padding under the floor of the doghouse. (PSOAF ¶ 13.) The doghouse had plastic sheeting that draped over the entrance to create a "draft barrier." (PSOF ¶ 4.) Frost had

accumulated near the top of the doghouse, and the structure was not completely sealed at the edges. (DSOF ¶ 16; RPSOAF ¶ 4; dkt. 139-2, ex. N.) There was some snow or ice on the floor of the doghouse near the entrance. (DSOF ¶ 16; RDSOF ¶ 16; dkt. 139-2 at ex. M.) The food dish inside the doghouse was empty. (DSOF ¶ 16.) The water bowl inside the doghouse did not have any drinkable water in it.[2] (DSOF ¶ 16; RDSOF ¶ 16.) There was a small heater inside the doghouse, which was working at least somewhat.[3] (DSOF ¶ 17; PSOF ¶ 18.) Neita later testified that on the morning of February 7, Macy had eaten, and he had left Macy water in the doghouse and checked that the heater was on, but he could not recall whether he checked the temperature inside of the doghouse (RPSOAF ¶ 5; dkt. 139-7 at 61:10–68:11.) The officers did not observe feces, urine, or excessive dirt inside the doghouse. (RPSOAF ¶ 17.)

Macy, who is an American short-haired pit bull (DSOF ¶ 18), was not wearing a coat, boots, or anything else to protect her from the weather (DSOF ¶ 19). She was observed repeatedly lifting her paws off the ground. (DSOF ¶ 20.) She was cold to the touch. (DSOF ¶ 22.)

After the officers had been at the lot for at least ten minutes, Enriquez untied Macy from the vehicle bumper. (DSOF ¶ 22–23.) Enriquez and Rittorno brought Macy to their van. (DSOF ¶ 24.) A few officers came to the scene, including Anthony Graffeo, who recorded some footage with his body-worn camera. (DSOF ¶ 25.) The officers took Macy out of the van, and as they walked onto the lot, she stopped to urinate. (PSOAF ¶ 10.) They then walked through the scene with her, and she does not appear to be shivering or raising her paws on the video. (PSOAF ¶ 9.)

---

[2] There is a dispute about whether the water dish was empty or whether it contained frozen water. In either case, it did not contain water that Macy could drink at the time the officers observed it.

[3] While all parties agree that the heater was working to some degree, there is a dispute about whether it was producing sufficient heat to make the doghouse habitable for Macy on February 7.

4

She seemed to be in good health and did not seem to be injured, underweight, or in pain. (PSOAF ¶ 14.)

After Graffeo and the other officers had left the scene, Neita arrived and approached Rittorno and Enriquez. (DSOF ¶ 26.) He had received a phone call saying that someone was on his property. (RPSOAF ¶ 5.) Macy tried to leave the minivan through a partially opened door, and Neita identified her as his dog. (PSOAF ¶ 19.) The officers told Neita they were going to hang onto Macy for a moment while they determined whether he was her owner. (PSOAF ¶ 20.) He told the officers that he had only gone next door for a moment and that the dog had not been outside very long, but an officer said the dog was being left out for days, which Neita denied. (PSOAF ¶ 20.) Neita was speaking on the phone with his sister, who is a Chicago Police Officer. (DSOF ¶ 27; PSOAF ¶ 21.) According to Neita's later testimony, Rittorno "got upset" because Neita "was fact checking her." (PSOAF ¶ 21.) The officers asked Neita for identification for himself or papers for Macy, but he did not provide either, although he told them that Macy had a microchip that would identify him as her owner. (DSOF ¶ 29; PSOAF ¶ 20.) Neita asked for a sergeant, and the officers told him they "don't have a sergeant." (PSOAF ¶ 22.) Neita's sister, who was listening on speaker phone, told Neita to ask for a "white shirt" (a police supervisor), and Enriquez replied, "What's a white shirt?" (*Id.*)

Shortly afterward, the officers arrested Neita and placed him in the backseat of the squad car. (DSOF ¶ 30–31.) While handcuffing Neita, Rittorno grabbed and dropped Neita's phone. (PSOAF ¶ 23.) Shortly after Neita was arrested, Sergeant Foster arrived and spoke with Rittorno and Enriquez as well as Neita.[4] (PSOAF ¶¶ 25–28.)

---

[4] Neita's Rule 56.1 statement contains additional facts about the events that occurred after his arrest, but they are not included here because they are not material to resolving his federal claims. (*See* dkt. 163 ¶¶ 23–40.) The court does not express any opinion on whether these facts may be relevant to his state law claims.

5

The next day, February 8, 2018, Neita was charged with violating two sections of the Illinois Humane Care for Animals Act. (DSOF ¶ 33; dkt. 1-1 at 1.) The first section, "owner's duties," reads, in relevant part:

> (a) Each owner shall provide for each of his or her animals:
> (1) a sufficient quantity of good quality, wholesome food and water;
> (2) adequate shelter and protection from the weather; … [and]
> (4) humane care and treatment.
> (b) To lawfully tether a dog outdoors, an owner must ensure that the dog: …
> (5) is tethered with a properly fitting harness or collar other than the lead or a pinch, prong, or choke-type collar[.]

510 ILCS 70/3(a–b). The second section, "cruel treatment," reads, in relevant part:

> (a) No person or owner may beat, cruelly treat, torment, starve, overwork or otherwise abuse any animal.
> (b) No owner may abandon any animal where it may become a public charge or may suffer injury, hunger or exposure.

510 ILCS 70/3.01(a–b). In April 2018, following a bench trial, the Circuit Court of Cook County entered a directed verdict in Neita's favor. (DSOF ¶ 35.)

## **LEGAL STANDARD**

Summary judgment is appropriate where there is no genuine dispute of material fact, entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant has the initial responsibility of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). If the movant carries its burden, the nonmovant must then show a genuine dispute of fact supported by "proper documentary evidence." *Weaver* v. *Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). The nonmovant must do more than raise "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); rather, he "must

6

present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. The court views all facts in the light most favorable to the nonmovant and draws all reasonable inferences in his favor. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## ANALYSIS

I. **Neita's Opposition to Defendants' Evidence**

Before addressing the merits of defendants' motion for summary judgment, the court first considers Neita's evidentiary objections. First, Neita attempts to narrow the scope of the evidence the court may review in support of probable cause by pointing out that, in their amended answers, defendants admitted the following allegation:

> The material facts relied on by the Defendants to support probable cause to arrest Plaintiff, to seize Macy, and to prosecute Plaintiff are set forth in: (a) the Exhibit 1 Incident Narrative Section under the heading, "the facts for probable cause to arrest AND to substantiate the charges;" (b) in the Exhibit 2 Supplementary Report; (c) in the Exhibit 3 March 2018 Hearing Transcript; and/or (d) in the Exhibit 4 April 2018 Trial Transcript.

(Dkt 35 ¶ 31; dkt. 37 ¶ 31.) But the court cannot interpret this as an admission that the listed documents contain the *only* facts that might support probable cause. Moreover, the arrest report itself makes clear that "the facts for probable cause to arrest and to substantiate the charges include, *but are not limited to*" the facts listed in the "incident narrative." (Dkt. 1-1 at 2 (emphasis added)). As such, this admission does not limit the court's review of other evidence in the record.[5]

Next, Neita asks the court to disregard Officer Rittorno's affidavit (dkt. 139-2 at 1–3), arguing that it is a "sham" because it contradicts her deposition testimony as well as other earlier

---

[5] The court also finds no merit in Neita's request for sanctions related to this issue. (*See* dkt. 154 at 12.)

7

statements. (*See* dkt. 154 at 13–14.) In her deposition, Officer Rittorno stated that she did not have the service request summary reports (SRs) before she went to the scene. (Dkt. 139-6 at 325:7–8.) In her subsequent affidavit, she says that in her deposition, she had answered to the best of her recollection; later, upon being shown a copy of the email she received before going to the scene, she "realize[d] that [she] was mistaken and had, in fact, received, the SR prior to going to [the scene]." (Dkt. 139-2 ¶ 6.) As defendants correctly argue (*see* dkt. 165 at 4), this affidavit is not a "sham" because it is Rittorno's effort to clarify a point on which her memory failed during her deposition. *See James* v. *Hale*, 959 F.3d 307, 317 (7th Cir. 2020) ("[B]ecause a deponent may be confused by a question and his memory may fail, a judge may also consider an affidavit that contradicts a statement in a deposition if the statement is demonstrably mistaken.") (citation omitted).

Neita also argues that Rittorno's deposition testimony is unreliable due to contradictions between the deposition testimony and her earlier testimony at Neita's criminal trial. (*See* dkt. 154 at 15–18.) Although some of these discrepancies seem minor and might not necessarily undermine her credibility, the court agrees that Rittorno's apparent admission in her deposition that she perjured herself in an earlier proceeding is concerning (although the court notes that her counsel objected to the form of the questions throughout the exchange). (*See* dkt. 154 at 16; dkt. 139-6 at 338:1–9.) At the same time, Neita himself cites Rittorno's deposition to support several facts included in his Rule 56.1 statement (*see, e.g.*, dkt. 163 ¶¶ 6–10), which is seemingly in tension with his statement in his response brief that Rittorno's "testimony, as a whole, is not remotely believable." (Dkt. 154 at 18.) At any rate, the court accepts that there is a genuine issue

about Rittorno's credibility. As such, the court has not relied on Rittorno's deposition as the sole evidence in support of any fact in conducting its review of the record.[6]

Finally, the court declines Neita's request to sanction defendants under Rule 26(g) and 37(c) for failing to disclose certain body-worn camera footage during discovery (*see* dkt. 154 at 19). Defendants admit that Rittorno told defense counsel Emily Dory at the beginning of this suit that body-worn camera footage existed, but that they did not include it in their initial Rule 26 disclosures or in response to Neita's request for production of such footage. (PSOAF ¶¶ 37–39.) They did not ultimately produce this footage until after the court had ruled on Neita's motion for partial summary judgment (dkt. 68) and after defendants had taken Neita's deposition (PSOAF ¶ 40.). On October 20, 2020, Dory emailed Neita's counsel to say that "it ha[d] recently come to Defendants['] attention" that officers at the scene were wearing body-worn cameras. Defendants then produced the video files to Neita. This production was within the extended discovery deadline (*see* dkt. 71) and well before defendants filed the instant motion for summary judgment. The court discerns no basis, from the facts currently before it, to impose sanctions under Rule 26(g) or 37(c).

## II.    Federal Claims (Counts I, II, IV, V, and VI)

The motion can be resolved on defendants' assertion of qualified immunity.[7]  Qualified immunity "protects government officials from liability for civil damages insofar as their conduct

---

[6] The court will not impose sanctions pursuant to Neita's request in his response brief (*see* dkt. 154 at 13), as the court cannot conclude that Rittorno's affidavit was "submitted in bath faith or solely for delay." Fed. R. Civ. P. 56(h).

[7] Although defendants (and Neita), at times, seem to conflate qualified immunity with the merits, defendants have sufficiently raised the defense. Rittorno's and Enriquez's amended answer asserted that they are entitled to qualified immunity (*see* dkt. 35 at 14 ¶ 1), as does defendants' summary judgment motion (*see* dkt. 143 at 5). Neita's response brief also discusses qualified immunity (*see* dkt. 154 at 20), so he certainly had "adequate notice" that defendants had invoked the defense. *Hernandez* v. *Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011).

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Leiser* v. *Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (cleaned up). Once raised, it became Neita's burden to show "(1) that the [officers] violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). The court is permitted to address the second prong before the first, *see Leiser*, 933 F.3d at 701 (citing *Pearson* v. *Callahan*, 555 U.S. 223, 236 (2009)), and it "may rest [its] decision on either prong," *Howell* v. *Smith*, 853 F.3d 892, 897 (7th Cir. 2017).

To demonstrate the violation of a clearly established right, Neita must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser*, 933 F.3d at 701 (citation omitted). The right at issue cannot be defined too generally; "[t]he general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of *particular* conduct is clearly established." *Al-Kidd*, 563 U.S. at 742 (emphasis added).

Neita fails to meet his burden with either approach. He fails to cite any analogous case that would show that the officers violated his clearly established rights. Some of the cases he provides are too factually dissimilar to be considered "reasonably analogous" or are readily distinguishable. (*See, e.g.*, dkt. 154 at 22–23 (citing *BeVier* v. *Hucal*, 806 F.2d 123 (7th Cir. 1986); *Alabama* v. *White*, 496 U.S. 325 (1990)).) For example, in *BeVier*, the parents of young children were arrested after an officer came across them in a situation that suggested neglect. The officer spoke to the babysitter, who gave information about the children that was ambiguous

about the children's care. An officer summoned an ambulance. The father came to the scene as the children were being placed in the ambulance. Without asking any questions, the officer arrested the father. The court ruled that, although there was "weak" support for a case of neglect, the crime included an element of intent. By failing to question the father, the officer had no evidence of intent when he made the arrest. Although there are some parallels with the instant case in terms of apparent neglect, the officers here did have at least arguable probable cause to believe Neita, who admitted owning Macy and putting her where she was, had committed a crime of inhumane treatment when they observed Macy without food, drinkable water, and without adequate protection from the weather. *See Gutierrez* v. *Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013) ("[Q]ualified immunity provides shelter for officers who have 'arguable probable cause' to arrest—i.e., those officers that reasonably but mistakenly believe they have probable cause."); *Abbott* v. *Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) ("Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime.").[8]

Neita also cites cases that do not discuss probable cause at all but instead address the constitutionality of the animal cruelty statute or the evidence required to sustain a conviction under it. (*See, e.g.*, dkt. 154 at 24–26, 30 (citing *People* v. *Curtis*, 944 N.E.2d 806 (2011); *People* v. *Collier*, 2020 IL App (1st) 162519).) Neita cites other cases in which officers were found to have had probable cause to arrest for inhumane treatment of animals. To the extent he provides these as analogous cases, they also cannot support his qualified immunity argument because he is

---

[8] *White* dealt with whether an anonymous tip was reliable enough to justify an investigatory stop. The Court ruled that in the circumstances presented it was. This case does not seem to advance Neita's cause at all.

conceding that probable cause existed. (*See, e.g.*, dkt. 154 at 28, 30–31 (citing *Ferrell* v. *Soto*, 2008 WL 342957 (N.D. Ill. Feb. 5, 2008); *Manson* v. *City of Chicago*, 795 F. Supp. 2d 763 (N.D. Ill. 2011)).) Perhaps most tellingly, in the section of his brief addressing the "inadequate shelter and protection from the weather" allegation, he does not cite a single case. (*See* dkt. 154 at 32–34.)

In the absence of any reasonably analogous case, Neita also fails to "persuad[e] the court that the [officers'] conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 723–24. These are "rare cases." *Jacobs* v. *City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000). Neita does not point to any egregious conduct that would negate qualified immunity.

Because the officers had at least arguable probable cause to arrest Neita for violating the "owners' duties" section of the statute, and because probable cause exists where the officers reasonably suspect a person of committing *any* crime, the court need not decide whether the officers also had arguable probable cause to arrest him for violating the "cruel treatment" section in order to dispense with his false arrest claim. Rittorno and Enriquez are entitled to summary judgment on Count I on qualified immunity grounds.

The officers' arguable probable cause to arrest Neita also defeats his retaliatory arrest claim. As defendants point out (*see* dkt. 143 at 15–16), Neita was arrested before the Supreme Court decided *Nieves* v. *Bartlett*, 139 S. Ct. 1715 (2019). At the time of Neita's arrest in 2018, "the Supreme Court had specifically stated that it had 'never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause.'" *Lund* v. *City of Rockford, Illinois*, 956 F.3d 938, 948 (7th Cir. 2020) (quoting *Reichle* v. *Howards*, 566 U.S. 658, 664 (2012)). And for qualified immunity, the relevant inquiry is whether the officers violated a

12

"right [that] was 'clearly established' at the time of the challenged conduct." *Al-Kidd*, 563 U.S. at 735 (citation omitted). The officers are thus entitled to summary judgment on Count V on qualified immunity grounds.

With respect to the officers' seizure of Macy, Neita provides only a brief argument that it did not qualify as a seizure incident to his arrest under the statute because they first took her off the lot before they arrested Neita (*see* dkt. 154 at 35). But even if that were true, he would still need to identify analogous case law or supply an argument that the officers' conduct was so egregiously unlawful as to void the protection of qualified immunity. He does not. The officers are entitled to summary judgment on Count II on qualified immunity grounds.

With Counts I, II, and V eliminated, Counts IV (conspiracy to deprive constitutional rights) and VI (failure to intervene) fail as well, because both of these claims require an underlying constitutional violation. *See Gill* v. *City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

## III. State Law Claims (Counts VII and VIII)

Having determined that defendants are entitled to summary judgment on the federal claims, the court declines to exercise its supplemental jurisdiction over the remaining state law claims for indemnification (Count VII) and malicious prosecution (Count VIII). *See* 28 U.S.C. § 1367(c)(3).

## **CONCLUSION AND ORDER**

Defendants' motion for summary judgment (dkt. 138) is granted with respect to Counts I, II, IV, V, and VI. Counts VII and VIII are dismissed without prejudice to refiling in an Illinois court. This order and the prior order on defendants' motion to dismiss (dkt. 28) resolve all claims against all parties. The Clerk is directed to enter final judgment under Rule 58. Case terminated.

Date: March 28, 2023 _____
U.S. District Judge Joan H. Lefkow